ATWOOD ET AL., APPELLEES, *v.*
JUDGE, DIRECTOR, APPELLANT.[1]

[Cite as Atwood v. Judge (1977), 63 Ohio App. 2d 94.]

---

[1] Reporter's Note: A motion to certify the record was overruled by the Supreme Court of Ohio, April 20, 1978.

(No. 1133—Decided December 23, 1977.)

*Mr. J. Michael Kapp,* for appellees.
*Mr. David Buzzard,* city solicitor, for appellant.

LYNCH, J. Defendant, the Director of Public Service-Safety of East Liverpool, is appealing the February 14, 1977, judgment entry of the trial court which permanently enjoined him from (1) laying off any fire fighters from the East Liverpool Fire Department, (2) laying off any policeman from the East Liverpool Police Department, or (3) from issuing any order or causing any orders to be issued denying any fire fighter or policemen their just and due payment pursuant to the contract entered into with the city of East Liverpool and the patrolmen and fire fighters on the 22nd day of April 1976.

By letter mailed May 27, 1976, defendant notified seven fire fighters and six policemen, all of which are plaintiffs, that due to the financial condition of the city of East Liverpool they were to be laid off effective June 1, 1976, and that they would be rehired pursuant to the rules and regulations of the Civil Service Commission of the city of East Liverpool, when operational funds became available.

On June 1, 1976, plaintiffs filed their complaint for a temporary and permanent injunction and the trial court granted a temporary restraining order.

On June 2, 1976, defendant filed a motion to dismiss the complaint pursuant to Civil Rule 12(B)(1) and (6) because the plaintiff employees of the city of East Liverpool had not appealed defendant's layoff order to the East Liverpool Civil Service Commission. This motion was argued before the trial court on June 3, 1976, and was overruled on June 15, 1976.

On June 3, 1976, a hearing was held on plaintiffs' motion for a temporary injunction and continued until June 16, 1976, for further testimony. The June 1, 1976, temporary restraining order was continued in force and effect.

On June 16, 1976, the trial court received additional evidence and continued the case until June 23, 1976, when the case was completed.

On July 6, 1976, the trial court granted the preliminary injunction against defendant.

On February 1, 1977, the final hearing in this case was held, but no additional evidence was introduced. The hearing consisted of arguments of counsel for both sides. The judgment entry was filed February 14, 1977.

The city of East Liverpool does not have a charter; therefore, it is a statutory city subject to the general laws of the state of Ohio for administrative purposes.

The trial court found in his February 14, 1977, judgment entry that the defendant, as Director of Safety-Service of the city of East Liverpool, by his conduct and action unlawfully attempted to legislate and to amend Section 145.01, Section 147.01 and Chapter 146 of the codified ordinances of the city of East Liverpool which was the sole function and responsibility of the city council and that defendant violated the provisions of the United States Constitution and the Constitution of Ohio as to the separation of powers between the legislative and executive branch of government.

The trial court further found that defendant's action was arbitrary and capricious and in excess of his power and duty as set out by R. C. 737.02 and constituted a gross abuse of discretion; that the financial condition of the city of East Liverpool did not warrant the layoffs and that had such layoffs been effected they would have dangerously injured the health, safety and welfare of the residents of the city of East Liverpool.

R. C. 737.02 provides, in pertinent part, as follows:

"Under the direction of the mayor, the director of public safety shall be the executive head of the police and fire departments***. He shall have all powers and duties connected with and incident to the appointment, regulation, and government of such departments except as otherwise provided by law.***"

R. C. 737.05 provides, in pertinent part, as follows:

"The police department of each city shall be composed of a chief of police and such other officers, patrolmen, and employees as the legislative authority thereof provides by ordinance."

R. C. 737.08 provides, in pertinent part, as follows:

"The fire department of each city shall be composed of a chief of the fire department and such other officers, fire fighters, and employees as provided by ordinance,* * *."

Set out below are pertinent Codified Ordinances of the city of East Liverpool:

"Section 145.01. The regular Police Department of the city shall be composed of: One Chief, One Captain, Four Lieutenants and 25 patrolmen.

"Section 147.01. The regular Fire Department of the city shall be composed of: One Chief, Three Assistant Chiefs, Three Lieutenants and 27 firemen."

Chapter 146 of the ordinances established a Juvenile Police Bureau in the Police Department.

The evidence established that in 1976 East Liverpool had twenty to twenty-one thousand residents living in an area of approximately four and one-half square miles. The city is built on hills. The way the town is laid out, the east end is completely isolated from the rest of the town. Pleasant Heights is another area which is isolated from the rest of the town.

The council negotiated a contract dated April 22, 1976, with plaintiff East Liverpool Fire Fighters Union Local #24, I.A.F.F. and the East Liverpool Police Department providing for salaries and other benefits from January 1, 1976, until December 31, 1977, for all members of the East Liverpool fire and police departments. On April 5, 1976, the Council passed Ordinance No. 13 which authorized and directed defendant to execute the contract. Defendant executed the contract and it was approved by the Mayor on April 6, 1976.

Mayor H. A. Tullis, who assumed office January 1, 1976, testified that before the layoffs in question were made he consulted the finance committee of city council, the Director of Public Service-Safety, the Auditor and the Solicitor. He stated that the chairman of the finance committee told him how much money was left for salaries to operate each department of the city for the rest of the fiscal year; that on the basis of projected or anticipated income of the city his best estimate was that there would be no money left to pay anybody on the city payroll after September 30, 1976, and that he told defendant that the only thing they could do was to curtail employment because if they waited until October, there would be no money left to pay anybody on the city payroll.

James Lowe, finance chairman of Council, verified that he gave the Mayor and defendant an estimate of what was anticipated for salaries in each and every department and an estimate of what could be left at a certain date; that excluding sewer, water and hospital revenues the anticipated remaining revenues for 1976 totaled $2,124,422 and the 1976 appropriation totaled approximately $2,121,957 which did not include the raises for all city employees which totaled approximately $220,000; that he advised the Mayor that there would be a salary overrun by the end of the year if the city were to continue its current level of spending of approximately $57,000 in the fire department and $41,000 in the police department; and that he had several discussions with defendant and told him that there would be no more money appropriated for wages and that defendant had to operate with the funds that he had.

Defendant has been Director of Public Service-Safety since January 20, 1976, and at one time worked for the sewerage department for three years as an operator's helper. He had no bookkeeping or accounting training or experience prior to assuming his present position. Most of his work as Director of Public Service-Safety had been with the street department and the incinerator. Before laying off the policemen and firemen, he checked with the city Auditor to find out what was left for wages for the rest of the year in the police and fire departments as compared to the appropriations for such departments. The annual salary of the policemen and fire fighters who were laid off amounted to $10,065 per year which is approximately $838.75 per month. Laying off six policemen for 7 months would save the city $35,227.50.

Mrs. Elizabeth Oliver, Auditor, testified that the appropriation for police salaries was $262,000; that for the first eleven pay periods for 1976 the total paid salaries of police officers was $142,397.57, which when divided by eleven and the result multiplied by 24 would result in a projected total for 1976 salaries for police officers of $310,685.59, a deficit of $35,035.59 over the amount appropriated; that the appropriation for fire salaries was $299,650; that for the first eleven pay periods for 1976 the total paid for salaries for fire fighters was $158,330.05, which when devided by eleven and the result multiplied by 24 would result in a projected total for 1976 salaries for fire fighters of $345,447.36, a deficit of $45,797.36

over the amount appropriated; and that the pay raise negotiated in April 1976 amounted to a seventeen percent increase in the wages of policemen and fire fighters.

Although ordinance No. 147.01 authorized a total of 34 firemen, there were two vacancies so that the total number of firemen on May 27, 1976, was 32 men. One fireman from each shift for a total of three are on vacation at all times. On June 3, 1976, there were two firemen off on extended leave because of injuries or illness.

The fire department has three shifts and the firemen work 24 hours and are off 48 hours. There are four stations, namely, Central or Downtown, Northside, Pleasant Heights and East End. With nine men to a shift, three firemen would be stationed at the Central Station and two each at the other stations. Since January 1976 at least one station was closed because of lack of manpower. If seven firemen were laid off there would be six men to a shift with one shift having seven men. They then would probably station four men at Central Station and have one outside station. The other two stations would have to be closed.

Plaintiffs' testimony was that it is important to get to a fire within the first five minutes, otherwise you lose control of the fire. That is why having all the stations open is important for the fire protection of the inhabitants of East Liverpool. Furthermore, the reduction in manpower would make the work of the remaining firemen more hazardous because of lack of adequate supervision.

Although ordinance No. 145.01 authorized a total of 31 policemen, there were two vacancies so that the total number of policemen on May 27, 1976, was 29 men. Three men on an average are on vacation at all times and one man on an average is on sick leave. One policeman was off duty because of injuries.

The police department has three shifts around the clock and a relief shift. Each man works 40 hours a week. They have three cruiser zones and one officer walks the downtown beat. There is a supervisor on each shift plus a dispatcher who stays in the office. There is also a juvenile department with one officer who handles approximately 700 to 800 cases every year and a detective department with three detectives who handle approximately 1,200 to 1,500 investigations a year. If six

policemen were laid off, the juvenile department and detective department would have to be eliminated, and they might have to cut the cruiser zones to two. There would be four men per shift on the street, one of which would be the supervisor. The detective department was established October 15, 1967, because a grand jury complained to the Chief of Police that their cases were not properly prepared and submitted properly to the grand jury. The juvenile department was established to relieve the Juvenile Court of many minor problems. The state of Ohio pays $3,500 for the juvenile bureau. These restrictions would reduce the effectiveness of the police department and make the work of the remaining policemen more hazardous because of the reduced availability of back-up men.

Although not at issue in this lawsuit, the evidence revealed that four men were laid off in the street department and another four men were laid off in the garbage department.

We raised the question as to whether the issues in this case are moot, because the evidence was directed at the financial condition of the city of East Liverpool for the year 1976 which is now past history; however, the injunction granted is a permanent one that continues beyond the year 1976. Furthermore, there is no evidence in the case as to how the city of East Liverpool handled the payment of salaries of the seven fire fighters and the six policemen whom defendant attempted to lay off or whether the revenues of East Liverpool for 1976 finally exceeded the official certificate of estimated resources so that the city council could appropriate sufficient money to pay all city employees including the fire fighters and policemen.

Defendant's first assignment of error is that the trial court erred in taking jurisdiction of the case absent an administrative appeal by the laid off employees to the civil service commission.

Pursuant to *Haught* v. *Dayton* (1973), 34 Ohio St. 2d 32, we hold that the seven laid off fire fighters and the six laid off policemen had the right to appeal to the East Liverpool Civil Service Commission pursuant to R. C. 124.34 and, if necessary, to appeal the decision of the civil service commission to the Common Pleas Court pursuant to R. C. 124.34 and 2506.01. Therefore, they had an adequate remedy at law and could not bring this injunctive action.

R. C. 124.56[2] provides, in pertinent part, as follows:

"When***a municipal***civil service commission has reason to believe that any officer,***head of a department, or person having the power of***layoff***has abused such power by making [a]***layoff***under his or their jurisdiction in violation of this chapter of the Revised Code, the***commission shall make an investigation, and if it finds that such a violation of this chapter, or the intent and spirit of this chapter has occurred, it shall make a report to***the mayor or other chief appointing authority***who may remove forthwith such guilty officer,***head of department, or person. The officer or employee shall first be given an opportunity to be publicly heard in person or by counsel in his own defense. The action of removal by the***mayor, or other chief appointing authority is final except as otherwise provided in this chapter of the Revised Code." Cf. *Anderson* v. *Minter* (1972), 32 Ohio St. 2d 207, 211.

There are twenty-two plaintiffs in this case of which two were citizen taxpayers and six were fire fighters and policemen who were not laid off. All plaintiffs sought to enjoin the defendant from proceeding with arbitrary, capricious, illegal actions that would immediately result in the jeopardizing of the lives and property of all the citizens of East Liverpool. As to the two citizen taxpayers and six fire fighters and policemen who were not laid off that are plaintiffs, we hold that they had no adequate remedy at law and that the trial court properly took jurisdiction of this case.

Therefore, we overrule defendant's first assignment of error.

Defendant's second assignment of error is that the trial court, after first granting a temporary restraining order without notice to the appellant, erred in extending such order beyond 28 days absent any showing by the person against whom the order was directed that he consented to the extension for a longer period.

Civil Rule 65(A) restricts the duration of a temporary restraining order to fourteen days unless within such time the court, for good cause shown, extends the order for an additional fourteen days. The party against whom the order is

[2] This section was formerly R. C. 143.40 and was, on December 4, 1973, renumbered without substantive change, in 135 Ohio Laws 533, Part I.

directed can consent to the extension of such temporary restraining order for a longer period. A temporary restraining order is one that is granted without written or oral notice to the adverse party.

In the instant case the trial court granted a temporary restraining order on June 1, 1976, without notice to defendant. However, notice was given to defendant prior to the June 3, 1976, hearing, because defendant's counsel appeared and participated in such hearing. When the trial court continued the temporary restraining order after the hearing on June 3, 1976, we hold that such temporary restraining order became a preliminary injunction pursuant to Civil Rule 65(B) because it was issued after reasonable notice was given to defendant. Therefore, we hold that defendant's second assignment of error has no merit.

Defendant's fourth assignment of error is that policemen and fire fighters who are civil service employees of a city may be temporarily laid off in time of financial crisis, citing *Gannon* v. *Perk* (1975), 47 Ohio App. 2d 125, affirmed in 46 Ohio St. 2d 301.

The February 14, 1977, judgment entry of the trial court stated, in pertinent part, as follows:

"The court has examined the so-called 'Perk' case cited by the City and finds it to be obviously distinguishable from the facts in this case and therefore, not applicable."

We hold that the following language of *Gannon* v. *Perk* (1976), 46 Ohio St. 2d 301, at 312-313, is applicable to this case:

"In *State, ex rel., Buckman,* v. *Munson* (1943), 141 Ohio St. 319, 326, the court concluded that public employees may be laid-off for reasons of economy 'notwithstanding statutory or charter provisions to the effect that no employee in the classified service shall be removed except for cause***, the view being that such statutory or charter provisions***are not intended to restrict the public authorities in their efforts to effect necessary or desirable economies.'

"The reasoning of the court in *Munson* applies as well to the cause at bar. Lack of funds induced when projected income falls below anticipated expenses is a legitimate basis for laying off civil service employees, including safety personnel, so long as such layoffs are made in conformity with law. In the instant case, then, the issue becomes whether the layoff of policemen

and firemen was made in conformity with ordinances, charter provisions, and civil service rules of the city of Cleveland.

"The charter and ordinances of the city do not establish a mandatory priority for layoffs of municipal employees due to reasons of economy. Therefore, the power to lay off municipal employees must repose within the sound discretion of the mayor of the city, as its chief executive officer, to be exercised in accordance with law."

The above case affirmed the Court of Appeals case on the questions at issue in this case. The fact that Cleveland is a charter city and East Liverpool is not is a distinction without a difference. Sections 116 and 118 of the Cleveland Charter are similar to R. C. 737.05 and R. C. 737.08. Sections 1.3511 and 1.3502 of the Cleveland City Ordinances are similar to East Liverpool City Ordinances Nos. 145.01 and 147.01. *Gannon* v. *Perk* (1975), 47 Ohio App. 2d 125, 130-131, 135-137.

We hold that the fact that a statutory city has ordinances specifying the number and classifications of policemen and fire fighters does not prevent the director of public safety from temporarily laying off such employees when it is necessary to do so for financial reasons without prior approval from city council. *Gannon* v. *Perk* (1975), 47 Ohio App. 2d 125; *State, ex rel. Buckman,* v. *Munson* (1943), 141 Ohio St. 319.

We also hold that in the absence of an ordinance of a non-charter city pertaining to the laying off of civil service employees, including fire fighters and policemen for lack of funds, the director of public safety, under the direction of the mayor, has the authority to lay off such employees for lack of funds in accordance with law. R. C. 737.02. No ordinance of the city of East Liverpool pertaining to the laying off of civil service employees, including fire fighters and policemen for lack of funds, has been called to the attention of this court so that we assume that there is no such ordinance.

Although the authority to lay off municipal civil service employees for lack of funds belongs to the executive branch of the government in accordance with applicable city ordinances and state statutes, city council can subsequently change such administrative decisions by amending the appropriation ordinance by changing the priorities for laying off employees or curtailing services.

We hold that the trial court erred in finding that defen-

dant as safety-service director of the city of East Liverpool, by his conduct and actions in laying off seven fire fighters and six policemen, unlawfully tried to amend Section 145.01, Section 147.01 and Chapter 146 of the East Liverpool ordinances, which was the sole responsibility of the East Liverpool Council, and that defendant violated the provisions of the United States Constitution and the Constitution of Ohio, as to separation of powers between the legislative and executive branch of government. We sustain defendant's fourth assignment of error to the extent set out in this opinion.

Defendant's third assignment of error is that the trial court erred in concluding that his action was arbitrary and capricious and in excess of his powers and duties as set out by R. C. 737.02 and constituted a gross abuse of discretion.

In *Butler* v. *Karb* (1917), 96 Ohio St. 472, the court stated as follows, on pages 480-481:

"The manner in which the authority conferred by statute is to be exercised is left to the discretion of the officials of the municipality. The general principle is well established that in the absence of fraud or gross abuse of discretion the courts will not interfere with the discharge of such duties. It must at least appear that the public officers are transcending their powers or withholding some clear right, or perpetrating or threatening to commit a wrong, before the power of the courts may be invoked.***A mere departure from the exercise of sound judgment does not warrant the interposition of the court and the control and guidance of its mandate.

"The rule to be applied in actions such as this have been stated frequently, but probably nowhere better than in the opinion of the court in the case of *Dailey* v. *New Haven,* 60 Conn., 314, 319, where it is said: 'With the exercise of discretionary powers courts, rarely and only for grave reasons, interfere. These grave reasons are found only where fraud, corruption, improper motives or influences, plain disregard of duty, gross abuse of power or violation of law, enter into and characterize the result. Difference in opinion or judgment is never a sufficient ground for interference.' "

See 29 Ohio Jurisprudence 2d 317-318, Injunctions, Section 115.

By statute a municipal corporation is expressly prohibited from making any appropriation or expenditure of money ex-

cept in the manner provided in R. C. Chapter 5705. R. C. 5705.01(A) and (B); R. C. 5705.41; 44 Ohio Jurisprudence 2d 388, 391, Public Funds, Section 22; 39 Ohio Jurisprudence 2d 127, 128-129, Municipal Corporations, Section 367.

R. C. 5705.39 provides, in pertinent part, as follows:

"The total appropriations from each fund shall not exceed the total of the estimated revenue available for expenditure therefrom, as certified by the budget commission,***. No appropriation measure shall become effective until there is filed with the appropriating authority by the county auditor a certificate that the total appropriations from each fund, taken together with all other outstanding appropriations, do not exceed such official estimate or amended official estimate. When the appropriation does not exceed such official estimate, the county auditor shall give such certificate forthwith upon receiving from the appropriating authority a certified copy of the appropriation measure."

R. C. 733.13 provides, in pertinent part, as follows:

"The city auditor***shall not allow the amount set aside for any appropriation to be overdrawn, or the amount appropriated for one item of expenses to be drawn upon for any other purpose or allow a voucher to be paid unless sufficient funds are in the treasury of the municipal corporation to the credit of the fund upon which such voucher is drawn."

Section 28 of ordinance No. 2, which is the appropriation ordinance passed April 5, 1976, states in pertinent part, as follows:

"***[N]o warrants shall be drawn or paid for salaries or wages except***in accordance with law or Ordinance."

The evidence established that the original appropriation of the East Liverpool Council by law could not exceed the total official certificate of estimated resources; that in prior years the Council amended the appropriation ordinances several times during the year when the official certificate of estimated resources was amended to reflect the fact that revenues were exceeding the original estimated income, or to transfer funds from one fund to another because of changing needs or priorities; that such amendments to the official certificate of estimated resources usually occurred in November and December of each year; that in past years the annual appropriations for the public and fire departments were usually

under appropriated; that at the time the subject layoffs were made there was an amended official certificate of estimated resources dated February 5, 1976, that reflected an additional $143,000 increase in the estimated amount of the city income tax; and that on April 12, 1976, Council amended the appropriation ordinance by increasing the appropriation for salaries of firemen by $13,650 and of policemen by $13,650.

Upon a review of the entire evidence we find that Mayor Tullis made the decision in May 1976 that the projected income of the city was insufficient to pay the anticipated salaries of city employees for the rest of the year; that he instructed defendant to curtail employment of employees under his supervision; and that defendant complied with the Mayor's instructions and laid off employees under his supervision including seven fire fighters and six policemen.

The uncontradicted testimony of the city Auditor and the Finance Chairman of the city Council was that if spending continued at the same level that existed at the time the lay-offs were made the amounts appropriated for both firemen and policemen would be insufficient to pay their projected salary requirements. Mrs. Oliver estimated that if only the salaries were considered the deficit would be $45,797.36 for firemen and $35,035.59 for policemen. Mr. Lowe included in his estimate uniform allowances and additional holidays as well as regular salaries and stated that the deficit would be $57,000 for firemen and $41,000 for policemen. There is a mathematical relationship between the deficits projected by the Auditor in the appropriations for policemen and fire fighters by the end of the year and the salaries of the policemen and fire fighters that were laid off.

Plaintiffs contend that despite the financial condition of the city as appears from the amounts spent for salaries of policemen and fire fighters as of June 1, 1976, compared to the amounts appropriated for such purpose by Council, the prospect of additional revenues above the amended official certificate of estimated revenues based on past years did not justify the layoffs of policemen and firefighters.

Plaintiffs introduced evidence that receipts from the East Liverpool Income Tax for the first five months of 1976 were 3.89 percent over the first five months of 1975; that the total receipts for 1975 were $743,614; and that the amended official

certificate of estimated resources showed such receipts to be $743,000.

Plaintiffs contend that on the basis of a 3.89 percent increase in income tax receipts there would be a projected increase of $29,540 over the amount shown on the amended official certificate of estimated resources.

Plaintiffs also introduced evidence that the receipts from the East Liverpool Municipal Court for the first five months of 1976 were 7.06 percent lower than the first five months of 1975; that the total receipts for 1975 were $99,030.96 and that the East Liverpool budget estimated such receipts for 1976 as $71,000. Plaintiffs contend that on the basis of a 7.06 percent decline in such receipts there would be a projected income of $91,504.61 which would be an increase of $20,504.61 over the amount in the East Liverpool budget estimate.

We would have been more impressed if plaintiffs had introduced the actual receipts for the year 1976 for income tax and Municipal Court at the February 1, 1977, hearing.

Pursuant to R. C. 5705.36 and 5705.01(D) the Auditor has the responsibility of certifying additional city revenues to the county budget commission for the purpose of obtaining an amended official certificate of estimated resources showing such additional revenues. Defendant, the Mayor and Council had to make their decisions as to the financial condition of the city from the current amended official certificate of estimated resources. If such document did not reasonably reflect the actual revenues of the city, it was the responsibility of the Auditor and not the defendant to initiate the procedure to correct such document.

The Auditor is elected and vested with executive power. R. C. 733.01; R. C. 733.10. Therefore, neither the Mayor nor defendant had any control over the Auditor.

The Mayor consulted with the Auditor prior to making his decision that the financial condition of the city was such that city employees would have to be laid off and defendant checked with the Auditor to ascertain what remained for wages for the rest of the year in the police and fire departments as compared to the appropriations for such departments before the layoffs. We feel that the Auditor was aware that such layoffs were going to happen before they were made, but she did not

advise the county budget commission of any increase in receipts of East Liverpool.

The question of whether the Auditor was deficient in not advising the county budget commission of any increase in the receipts of East Liverpool above the amended official certificate of estimated resources is not an issue in this case because the Auditor is not a party to this lawsuit.

Plaintiffs point out that in the *Perk case, supra,* the city of Cleveland hired certified public accountants to verify the financial condition of Cleveland. There is no statute authorizing such a practice. If the city of East Liverpool had the authority to hire certified public accountants to verify its financial condition, the Mayor would have the discretion to decide whether this was necessary or financially feasible for the city. There is a big difference between the financial resources of Cleveland and East Liverpool. Under the facts of this case, we do not feel that it was necessary to hire private accountants to determine the financial condition of East Liverpool.

Plaintiffs also introduced evidence as to the amounts of funds in thirty-four separate accounts set up in accordance with the appropriation ordinance. Plaintiffs doubled the total amounts left over and contend that the total sum of $91,501.51 would be available for transfer to the police and fire departments.

If there were unexpended sums that could have been transferred to the police and fire departments, the proper forum to whose attention plaintiffs should bring this matter was Council who had the authority to amend the appropriation ordinance by transferring funds. *Curtis* v. *State* (1923), 108 Ohio St. 292, 308. There is nothing in the record to indicate that plaintiffs approached Council for such purpose.

The record does show that before such layoffs were made the Mayor consulted with the finance committee of Council and the chairman of such committee advised the Mayor that there would be salary overruns by the end of the year if the city were to continue its current level of spending and advised defendant that there would be no more money appropriated for wages and that defendant had to operate with the funds that he had. Defendant was also confronted with the fact that

there was a seventeen percent increase in the salaries of policemen and fire fighters in 1976 over the past year.

If Council did not increase the appropriations for the police and fire departments and the total salaries of the policemen and fire fighters exceeded the amounts appropriated by Council, the order of the trial court preventing the layoff of policemen and firemen would have caused the East Liverpool officials to pay that part of such salaries that exceeded such appropriations in violation of state statutes.

On the question of whether the financial condition of East Liverpool required the layoff of employees we hold that Mayor Tullis made reasonable inquiry of the persons who were familiar with the financial condition of the city of East Liverpool—namely, the finance committee of the Council, the Auditor and defendant—and that the information he received from such persons was reasonably sufficient for him to arrive at his decision that the city money appropriated for the salaries of city employees would run out before the end of the year and that his only alternative was to layoff some employees. Therefore, we hold under the facts of this case that the discretion of Mayor Tullis in deciding in May 1976 that the projected income of the city of East Liverpool was insufficient to pay the anticipated salaries of city employees for the rest of the year and that some employees had to be laid off was an honest and judicious decision and was not arbitrary or capricious.

We further hold that defendant, in making the decision as to whether the financial condition of the city required the layoff of fire fighters and policemen, could only consider the amended official certificate of estimated resources and the appropriations of Council as to the salaries of such employees and that only Council could increase such appropriations by transferring money from other funds.

We further hold after a review of the entire evidence that as of June 1, 1976, the projected expenditures for salaries of fire fighters and policemen for the rest of 1976 would exceed the amounts appropriated for such purposes pursuant to the amended official certificate of estimated resources and that the decision of defendant that the financial condition of the city required the layoffs of fire fighters and policemen was a

honest and judicious decision and was not arbitrary and capricious.

We recognize that a difficult problem arises when the financial situation of a city raises the question of whether city employees have to be laid off and a decision has to be made as to which employees and how many have to be laid off. The evidence in this case indicates that the laying off of seven fire fighters and six policemen would adversely affect the fire protection and police protection of the inhabitants of East Liverpool.

This decision as to which employees to lay off and what services to curtail is an administrative one to be made in conformity with applicable statutes and ordinances. A difference of opinion or judgment is not sufficient for a court to interfere with such a decision as long as it was honestly and judiciously exercised. Such decision is political in nature. It is apparent that plaintiffs strongly feel that the Mayor and at least one member of Council exercised poor judgment in laying off policemen and fire fighters. Such judgment can be effectively tested pursuant to R. C. 705.92 which provides for a removal of any elective official of a municipal corporation by recall.

For the foregoing reasons we sustain defendant's third assignment of error.

Defendant's fifth assignment of error is that the trial court erred in ordering that its permanent injunction should stand until Council legally rescinded, modified or changed the ordinances setting the composition of the city's police and fire departments.

The last paragraph of the trial court's February 14, 1977, judgment entry reads as follows:

"All until further order of the Court or until the City Council of East Liverpool legally rescinds, modifies, or changes the ordinance in question."

For the reasons stated in our discussion of defendant's third and fourth assignments of error, we hold that the above part of the trial court's judgment entry is a usurpation of the authority of the executive branch of the city of East Liverpool and is in error. Therefore, we sustain defendant's fifth assignment of error.

The judgment is reversed, and the prayer for a permanent injunction is denied.

*Judgment reversed.*

O'NEILL, P.J., concurs.

DONOFRIO, J., concurs in part and dissents in part.

DONOFRIO, J., concurring in part and dissenting in part. I concur in paragraphs one through seven, inclusive, of the syllabus as being sound law and following proper precedent. I concur in the majority opinion as to reversing the permanent injunction granted by the trial court, and in the language of the majority, at page 103, as follows:

"We hold that the fact that a statutory city has ordinances specifying the number and classifications of policemen and fire fighters does not prevent the director of public safety from temporarily laying off such employees when it is necessary to do so for financial reasons without prior approval from city council. *Gannon* v. *Perk* (1975), 47 Ohio App. 2d 125; *State, ex rel. Buckman,* v. *Munson* (1943), 141 Ohio State 319."

I respectfully dissent for the reason that the issue of sufficient financing of the safety forces has now become moot in that it is obvious that funds were available and paid to the safety forces and that the safety forces in question are still employees of the city of East Liverpool.

My second basis for dissent is that the trial court expressly found, and the evidence warrants from the record, that had the layoffs "been effected, they would have dangerously injured the health, safety and welfare of the residents of the City of East Liverpool."

In support of the trial judge's ruling on this finding, it appears to be implicit in the case of *Gannon* v. *Perk* (1976), 46 Ohio St. 2d 301, at pages 313, 314:

"The record in the instant cause clearly reveals that the layoffs at issue herein were necessitated due to lack of funds. Appellees have not shown that such layoffs were so excessive as to jeopardize the health, safety and welfare of the city and its inhabitants. Therefore, the judgment of the Court of Appeals with regard to the issue of the legality of the layoffs of safety forces in the city of Cleveland is affirmed."

So that it appears that the *Perk* case is not totally controlling in the instant case because of the finding of fact of the trial court herein. Further, as to the past actions by the city ex-

ecutive department, the court at that time found from the evidence that the financial condition of the city of East Liverpool did not warrant the layoffs. Therefore, the judgment of the trial court should be modified by limiting the injunction of the order of the Director of Public Service Safety to the time and events of the instant case only. The action of the trial judge in all other respects should be affirmed. This is not to say, however, that in the future, by the proper review of financing, the executive branch cannot fairly effectuate the layoff of city employees including safety forces if done according to law.

---

[1] Reporter's Note: A motion to certify the record was overruled by the Supreme Court of Ohio, September 13, 1979.